UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

REINA ELIZABETH RAMIREZ MEJIA, *et al.*,

    *Plaintiffs*,

    v.

CATHEDRAL LANE LLC d/b/a BOURBON ADAMS MORGAN, *et al.*,

    *Defendants*.

Civil Action No. 19-2492 (LLA)

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Reina Elizabeth Ramirez Mejia and Hector Echeverria bring this suit against their former employer for unpaid wages and damages. ECF No. 13. Gjergji Sinoimeri, the only remaining defendant in this case, moves for summary judgment. ECF No. 55. Plaintiffs cross-move for partial summary judgment. ECF No. 60. For the reasons explained below, the court will deny both parties' motions.

    **I.**    **Factual Background**

Plaintiffs worked as cooks at Bourbon Adams Morgan ("Bourbon"), a restaurant in the District of Columbia. ECF No. 57-1 ¶ 1. Ms. Mejia worked at the restaurant from 2014 to October 14, 2018. *Id.* ¶ 2. As relevant to this suit, Mr. Echeverria worked at Bourbon from September 2017 to late September 2018. *Id.* ¶ 3.

During Plaintiffs' employment, Bourbon was owned by a District of Columbia limited liability corporation, Cathedral Lane, LLC ("Cathedral"), which was formed to buy and operate the restaurant. *Id.* ¶¶ 1, 5. Cathedral's operating agreement designated members James Woods and Gjergji Sinoimeri as its "Managers"; the LLC's four other members "were essentially silent"

partners.  ECF No. 64-3 ¶¶ 14, 17.  Mr. Woods and Mr. Sinoimeri formed another LLC, Bourbon RE, to purchase the building that housed Bourbon.  ECF No. 57-1 ¶ 6.  While Plaintiffs were employed at Bourbon, Mr. Woods held a majority stake in both Bourbon RE (51%) and Cathedral Lane (53.82%).  *Id.* ¶ 7.  Mr. Sinoimeri worked full-time as a software engineer and ran a consulting business.  *Id.* ¶¶ 16-17.  He "wanted to invest in real estate and be a landlord," ECF No. 64-3 ¶ 1, and his "focus was the building" owned by Bourbon RE, ECF No. 57-1 ¶ 18.

The parties disagree about nearly every aspect of how Mr. Woods and Mr. Sinoimeri managed Bourbon.  Per Mr. Sinoimeri, Mr. Woods ran the restaurant while Mr. Sinoimeri was a passive investor who visited the restaurant sporadically.  *See* ECF No. 55-2, at 4-5.  When Mr. Sinoimeri sought to be more involved, Mr. Woods refused to share information and told him to "stay out of the restaurant's operations."  *Id.* at 5.  But according to Plaintiffs, Mr. Sinoimeri did have control over the business: he had a sizeable ownership stake, visited Bourbon and monitored the restaurant via a camera system when he was not there, had contact with employees, and involved himself in day-to-day operational decisions that impacted employees.  *See* ECF No. 60-1, at 9.

The parties do agree on one thing: Bourbon was not profitable.  ECF No. 64-3 ¶ 37.  By 2017, Cathedral's finances had become (as Mr. Woods admitted) "really bad."  *Id.* ¶ 40; ECF No. 57-3 (Pls. Ex. B), at 39:17-19.  In late 2017 and early 2018, Bourbon was operating "week to week."  ECF No. 64-3 ¶ 45.  At one point, Mr. Sinoimeri transferred $30,000 of his own funds to Cathedral to cover payroll and expenses.  *Id.* ¶¶ 79-80.  Mr. Sinoimeri was particularly concerned that Bourbon was not making its mortgage payments on time, because he had put his house up as collateral to secure the loan.  *See id.* ¶¶ 32, 42; ECF No. 60-1, at 16.  On several occasions, Mr. Sinoimeri transferred funds from Cathedral's bank account to pay Bourbon's mortgage; as a

result there was, allegedly, "no money left to pay employees." ECF No. 64-3 ¶¶ 102-03. As Bourbon's financial situation worsened, Mr. Sinoimeri became (or attempted to become) more involved with the business—and his relationship with Mr. Woods grew increasingly strained. *See* ECF No. 57-1 ¶ 75; ECF No. 57-3 (Pls. Ex. B), at 40:6-8; ECF No. 64-3 ¶¶ 47, 126. In April 2018, Mr. Woods had Mr. Sinoimeri served with a temporary restraining order. ECF No. 57-1 ¶ 90.

Plaintiffs allege that, around July 2018, Bourbon stopped paying them. ECF No. 13 ¶ 13. Plaintiffs continued working at the restaurant "based on Defendants' promise that they would pay Plaintiffs for all of their work time once the restaurant became more profitable and the funds were available." *Id.* That day never came. Mr. Echeverria resigned in late September 2018, and Ms. Mejia resigned on October 14, 2018. ECF No. 57-1 ¶¶ 1-2.

Mr. Woods left Bourbon in late October 2018, but the parties disagree about the nature of his departure and what happened after. *See* ECF No. 57-1 ¶ 73; ECF No. 64-3 ¶ 86. Mr. Sinoimeri alleges that after Mr. Woods "unilaterally closed Bourbon's doors on October 22, 2018, [Mr.] Sinoimeri searched for and found a company, Parlay, to come into the space and operate the restaurant." ECF No. 57-1 ¶ 73. According to Plaintiffs, "[t]here is simply no evidence that Parlay took over the restaurant"; rather, Plaintiffs allege that Mr. Sinoimeri reopened and operated Bourbon after Mr. Woods' departure. *Id.*

On December 4, 2018, Mr. Sinoimeri met with Plaintiffs. ECF No. 64-3 ¶ 145. The parties disagree about what happened during that meeting. *See id.* Plaintiffs allege that Mr. Sinoimeri "offered to continue to employ Plaintiffs at Bourbon and pay them going forward, but not for the wages which they were owed." *Id.* ¶ 146. Mr. Sinoimeri contends that he offered Plaintiffs the opportunity to apply for jobs at the new restaurant, unrelated to Bourbon, that was operating in the Bourbon space, but Plaintiffs declined. ECF No. 64-1, at 18.

## II.     Procedural History

Plaintiffs filed this action in August 2019.  ECF No. 1.  Ms. Mejia alleges that Defendants failed to pay her for at least 151 hours of work.  ECF No. 13 ¶ 15.  Mr. Echeverria alleges that Defendants failed to pay him for approximately 328 hours of work, and that he was not paid for overtime work in the spring and/or summer of 2018.  *Id.* ¶¶ 10, 14.  Both sue to recover unpaid wages and damages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*; the District of Columbia Minimum Wage Revision Act ("MWRA"), D.C. Code § 32-1001 *et seq.*; and the District of Columbia Wage Payment and Collection Law ("WPCL"), D.C. Code § 32-1301 *et seq.* (collectively, the "Wage Statutes").  *See* ECF No. 13.

Plaintiffs initially sued Mr. Sinoimeri, Mr. Woods, and Cathedral Lane.  *See* ECF No. 13.  Mr. Sinoimeri filed an answer.  ECF No. 19.  Cathedral and Mr. Woods failed to timely respond, and the Clerk of Court entered defaults against them.  *See* ECF Nos. 14 & 23.  Mr. Woods filed a suggestion of bankruptcy, ECF No. 27, and the parties ultimately dismissed him from the case without prejudice, ECF No. 29; Oct. 27, 2020 Minute Order.  The parties engaged in discovery, which concluded in October 2021.  *See* ECF No. 43, at 1.  Both parties then filed motions for summary judgment.  ECF Nos. 55, 57-62, 64, 66.  In February 2024, Mr. Sinoimeri indicated his intent to supplement his motion for summary judgment, *see* ECF Nos. 71 & 72, and the court therefore set a briefing schedule, *see* Mar. 15, 2024 Minute Order.  Mr. Sinoimeri later abandoned his plan to file a supplemental brief.  ECF No. 74.  The court will therefore proceed on the briefs as filed.  *See* Apr. 22, 2024 Minute Order.

## III.     Legal Standard

Under Federal Rule of Civil Procedure 56, "[a] party is entitled to summary judgment only if there is no genuine issue of material fact and judgment in the movant's favor is proper as a matter

of law." *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 805 (D.C. Cir. 2006)); *see* Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact" in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party must present specific facts supported by materials in the record that would be admissible at trial and that could enable a reasonable jury to find in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (noting that, on summary judgment, the appropriate inquiry is "whether, on the evidence so viewed, 'a reasonable jury could return a verdict for the nonmoving party'" (quoting *Liberty Lobby*, 477 U.S. at 248)).

"[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam), and "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *id.* at 651 (quoting *Liberty Lobby*, 477 U.S. at 255 (alteration in original)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000) (quoting *Liberty Lobby*, 477 U.S. at 255); *see Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 295-96 (D.C. Cir. 2015).

In addition, for a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *see Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*,

5

477 U.S. at 249-50 (citations omitted).  Moreover, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.  In that situation, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.*  The court is only required to consider the materials explicitly cited by the parties but may on its own accord consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

When parties file cross-motions for summary judgment, each motion is viewed separately, in the light most favorable to the nonmoving party, with the court "determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (quoting 10A Charles Alan Wright et al., *Federal Practice and Procedure* § 2720 (3d ed. 2016)); *see Fox v. Transam Leasing, Inc.*, 839 F.3d 1209, 1213 (10th Cir. 2016); *Pac. Indem. Co. v. Deming*, 828 F.3d 19, 23 (1st Cir. 2016).

### IV.    Discussion

This case presents two key questions.  First, was Mr. Sinoimeri Plaintiffs' "employer" such that he is liable for violations of the Wage Statutes?  Second, should the court pierce the corporate veil and hold Mr. Sinoimeri personally liable?[1]  The parties cross-move for summary judgment on the first issue.  Mr. Sinoimeri moves for summary judgment, which Plaintiffs oppose, on the second issue.

---

[1] These two questions present alternative theories of liability.  "[I]t is unnecessary to pierce the corporate veil to find individuals within a corporation personally liable for violations of the FLSA," *Kalkey v. Euromodas, Inc.*, No. 22-CV-1245, 2023 WL 8587965, at *11 (D.P.R. Dec. 11, 2023) (quoting *Qun Lin v. Cruz*, 239 A.3d 720, 735 (Md. Ct. Spec. App. 2020)), and the MWRA and WPCL "are construed consistently with the FLSA," *Izaguirre v. Hunter Allied of Md., Inc.*, No. 18-CV-965, 2019 WL 5597281, at *1 (D.D.C. Oct. 30, 2019).

#### A. Preliminary Matters

Mr. Sinoimeri makes two procedural arguments that are best addressed up front. First, he argues that Plaintiffs have forfeited the opportunity to dispute certain facts by failing "to admit or deny, or admit or deny in part, [Mr.] Sinoimeri's assertions as required by paragraph 13(c) of the Standing Order and fail[ing] to properly address [Mr.] Sinoimeri's assertion of fact as required by Rule 56(c)." ECF No. 64-1, at 3; *see* ECF No. 61, at 4-7 (raising similar arguments). The court finds that Plaintiffs have substantially complied with this court's standing order: they filed a counter-statement of disputed material facts that largely indicates where they agree and disagree with Mr. Sinoimeri, *see* ECF No. 57-1, and clarified their more ambiguous statements in a later filing, ECF No. 66, at 2-3.

Second, Mr. Sinoimeri argues that Plaintiffs' affidavits, ECF No. 57-9 (Pls. Ex. H) and ECF No. 57-10 (Pls. Ex. I), "appear to be fabricated" because they contradict Plaintiffs' prior written discovery responses. ECF No. 64-1, at 23. "Rule 56(h) authorizes the Court to sanction a party if it is 'satisfied that [the party's] affidavit or declaration . . . is submitted in bad faith[.]'" *Murray v. Shulkin*, 273 F. Supp. 3d 87, 93 n.3 (D.D.C. 2017); *see* Fed. R. Civ. P. 56(h). But the contradictions Mr. Sinoimeri identifies as evidence of bad faith amount to, at most, minor inconsistencies. For example, in their prior written responses, "Plaintiffs said [Mr.] Sinoimeri would frequent the restaurant and 'make sure things were going smoothly' or 'inspect the kitchen.'" ECF No. 64-1, at 23. Now, Ms. Mejia avers that Mr. Sinoimeri would sometimes "observe the workers, and walk around the restaurant to see how things were going. If necessary, he would direct the kitchen staff or waiters if he saw something that needed correcting, he would give instructions or directions." ECF No. 57-9 (Pls. Ex. H) ¶ 8. Such statements are hardly contradictory, and certainly not sufficiently contradictory to indicate bad faith. *See Turner v.*

7

*Baylor Richardson Med. Ctr.*, 476 F.3d 337, 349 (5th Cir. 2007) (distinguishing between indirectly inconsistent and directly contradictory statements).

### B. Statutory Employer

The parties cross-move for summary judgment on the question of whether Mr. Sinoimeri was Plaintiffs' "employer" within the meaning of the Wage Statutes. The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C § 203(d). That definition "is necessarily a broad one in accordance with the remedial purpose of the Act." *Morrison v. Int'l Programs Consortium, Inc.*, 253 F.3d 5, 10 (D.C. Cir. 2001) (quoting *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058 (2d Cir. 1988)). The MWRA's definition of "employer" is virtually identical to the FLSA's. D.C. Code § 32-1002(3). The WPCL defines "employer" (with some additions and exceptions not relevant here) as any individual or corporation "employing any person in the District of Columbia." D.C. Code § 32-1301(1B). "[C]ourts in this district have consistently concluded that determinations of employer or employee status under the FLSA apply equally under the District of Columbia wage laws." *Wright v. Off. of Wage Hour*, 301 A.3d 660, 684 (D.C. 2023) (quoting *Bonilla v. Power Design Inc.*, 201 F. Supp. 3d 60, 63 (D.D.C. 2016)); *see Guevara v. Ischia, Inc.*, 47 F. Supp. 3d 23, 26 (D.D.C. 2014) ("For purposes of individual liability, the word 'employer' in the FLSA and the DCMWA is generally interpreted in the same way." (citing *Williams v. WMATA*, 472 F.2d 1258, 1261 (D.C. Cir. 1972))). Thus, the court's analysis of whether Mr. Sinoimeri was Plaintiffs' "employer" is the same under all three statutes. *Id.*

To determine whether an individual is an "employer" under the Wage Statutes, this court applies the "economic reality" test. *See Morrison*, 253 F.3d at 11 (applying economic reality test to the FLSA); *Steinke v. P5 Sols., Inc.*, 282 A.3d 1076, 1084-85 (D.C. 2022) (applying economic reality test to the WPCL). The economic reality test considers "whether the alleged employer

8

(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Morrison*, 253 F.3d at 11 (quoting *Henthorn v. Dep't of Navy*, 29 F.3d 682, 684 (D.C. Cir. 1994)).  However, "[n]o one factor standing alone is dispositive and courts are directed to look at the totality of the circumstances and consider any relevant evidence." *Id.*

Mr. Sinoimeri admits that he was an owner and member of Cathedral.  ECF No. 19 ¶ 5. "[A] corporate officer may qualify as an employer along with the corporation if the officer has operational control of the corporation's enterprise." *Orellana v. NBSB Inc.*, 332 F. Supp. 3d 252, 263 (D.D.C. 2018); *see Ruffin v. New Destination, LLC*, 800 F. Supp. 2d 262, 269 (D.D.C. 2011) ("The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer . . . under the FLSA." (quoting *Donovan v. Agnew*, 712 F.2d 1509, 1511 (2d Cir. 1983))).  "To determine whether a corporate officer has operational control, the Court looks at the factors [of the economic reality test] plus the ownership interest of the corporate officer."  *Orellana*, 332 F. Supp. at 263 (quoting *Ventura v. Bebo Foods, Inc.*, 738 F. Supp. 2d 1, 5-6 (D.D.C. 2010)).  "A Defendant's ownership interest in an employer corporation, while not dispositive of employer status under the FLSA, certainly raises a plausible inference that the individual possessed the requisite 'operational control' over the covered entity."  *Wilson v. Hunam Inn, Inc.*, 126 F. Supp. 3d 1, 6 (D.D.C. 2015); *see Romero v. RBS Constr. Corp.*, No. 18-CV-179, 2022 WL 522989, at *12 (D.D.C. Feb. 22, 2022) ("[F]inancial control over a corporation is a significant factor in determining whether an individual meets the statutory definition of an employer.").

The parties paint very different pictures of Mr. Sinoimeri's involvement (or lack thereof) in Bourbon's operations and employment decisions.  Mr. Sinoimeri portrays himself as a "hands-off" investor who had little access to or involvement with Bourbon's employees, *see* ECF No. 55-2, at 21, while Plaintiffs contend that Mr. Sinoimeri wielded significant authority and control, *see* ECF No. 60-1, at 9.  The parties also disagree about the precise contours of the economic reality test, and therefore whether certain facts are material.  *See, e.g.*, ECF No. 64-1, at 11-13; ECF No. 66, at 8-9, 12.  Because the economic reality test is flexible and context-specific, there is inevitably some variation in how courts apply it.  *See Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 143 (2d Cir. 2008) (emphasizing the "necessary flexibility" of the economic reality test); *Morrison*, 253 F.3d at 11 (citing two "different, although similar, set[s] of factors" that courts may consider when applying the economic reality test).  But regardless of which party's version of the economic reality test the court applies, the court concludes that summary judgment is inappropriate because the parties raise genuine disputes of material fact that bear on several prongs of the test.  *See Orellana*, 332 F. Supp. 3d at 263-64 (denying summary judgment where the parties offered conflicting accounts of alleged employer's role).

*Hiring and firing.*  The first prong of the economic reality test asks whether the alleged employer "had the power to hire and fire the employees." *Morrison*, 253 F.3d at 11 (quoting *Henthorn*, 29 F.3d at 684).  The parties agree that Mr. Sinoimeri "would recommend his contacts for certain positions in the restaurant," and "advise" Mr. Woods about potential hires.  *See* ECF No. 57-1 ¶ 40; ECF No. 64-3 ¶ 119.  However, the parties dispute whether Mr. Woods took Mr. Sinoimeri's advice (in other words: whether Mr. Sinoimeri's words carried any weight), and whether Mr. Sinoimeri attempted to hire anyone without Mr. Woods' involvement.  *See* ECF No. 64-3 ¶¶ 117-22.

10

Per Plaintiffs, "perhaps the best evidence that [Mr.] Sinoimeri had the authority to hire and fire employees of Bourbon is that he did so after [Mr.] Woods left Bourbon in October 2018." ECF No. 60-1, at 22.  But here, too, there are genuine factual disputes: did Mr. Sinoimeri in fact offer Plaintiffs jobs at the December 2018 meeting?  *See* ECF No. 64-1, at 18.  And did Bourbon still exist when Mr. Sinoimeri met with Plaintiffs and offered them jobs, or was Mr. Sinoimeri acting on behalf of a pop-up restaurant, Parlay, that was independent from Bourbon and merely using its former space?  *See* ECF No. 64-3 ¶¶ 144, 146-50.  Mr. Sinoimeri argues that, regardless, any actions he took after Plaintiffs left Bourbon are immaterial to whether he was their statutory employer when the Wage Statute violations occurred.  *See* ECF No. 64-1, at 7.  But the economic reality test requires the court to examine "the totality of the circumstances" and "consider any relevant evidence."  *Morrison*, 253 F.3d 5 at 11.  The fact that a corporate officer met with former employees to discuss unpaid wages and possible future employment may—in some circumstances—suggest that the corporate officer could be held liable under FLSA as an "employer."  *Cf. Grant v. HER Imps. NY, LLC*, No. 15-CV-5100, 2018 WL 3133454, at *17 (E.D.N.Y. Feb. 16, 2018), *report and recommendation adopted*, 2018 WL 1686103 (E.D.N.Y. Mar. 31, 2018) (noting, in determining whether defendant was a FLSA "employer" under the substantial continuity test, that the inquiry "often turns on facts that occur after the putative employee's employment ends," and explaining that "[the] plaintiff may be . . . protected as she worked for one entity[,] . . . she sought compensation under the FLSA for unpaid wages, the defendants that hired her have defaulted and the defendants operating in the defaulted defendants' place claim they had nothing to do with plaintiff's employment.").

*Employee schedules and work conditions.*  The parties also raise genuine disputes of material fact on the second prong of the economic reality test: whether Mr. Sinoimeri "supervised

11

and controlled employee work schedules or conditions of employment." *Morrison*, 253 F.3d at 11 (quoting *Henthorn*, 29 F.3d at 684). Plaintiffs do not deny that Mr. Woods was solely responsible for creating employees' schedules, although they argue that Mr. Sinoimeri had input in setting operating hours which in turn impacted employee schedules. *See* ECF No. 57-1 ¶ 42. The parties cite conflicting evidence as to whether Mr. Sinoimeri (1) attended some all-staff meetings, (2) had input on staff training and development, (3) monitored Bourbon via a Nest camera system when he was not there, (4) communicated with Mr. Woods about operational matters, including personnel, (5) "reprimanded" an employee, and (6) was physically present at Bourbon during the time when the alleged wage violations were committed. *Id.* ¶¶ 45-46, 81-82, 90; ECF No. 64-3 ¶¶ 127, 129, 131, 140.

*Payment.* The third prong of the test—whether Mr. Sinoimeri determined employees' rate and method of payment—is similarly unclear. *See Morrison*, 253 F.3d at 11. Mr. Sinoimeri admits that he knew Bourbon "was doing 'partial payroll' and delaying payments to some employees," and that employees' checks were bouncing. ECF No. 64-3 ¶¶ 72, 78. At one point, he used $30,000 of his personal funds to "keep everyone" paid, and to cover Bourbon's expenses. *Id.* ¶¶ 79-80. However, the parties cite conflicting testimony and evidence regarding how much input Mr. Sinoimeri had in setting employees' pay, *see id.* ¶¶ 111, 123; whether he had access to and monitored payroll, *see id.* ¶¶ 50-51, 55-56; whether employees complained to him when they were not paid, *see id.* ¶ 83; ECF No. 57-1 ¶ 43; and whether he told Plaintiffs at the December 2018 meeting that he would not pay them back wages, *see* ECF No. 64-1, at 18.

*Employment records.* The fourth prong of the economic reality test considers whether the alleged employer maintained employment records. *See Morrison*, 253 F.3d at 11. Plaintiffs

concede that Mr. Sinoimeri "did not personally maintain employee records," but note that this factor, standing alone, is not dispositive. ECF No. 57, at 26.

*Additional evidence.* Plaintiffs raise additional relevant evidence, *see Morrison*, 253 F.3d at 11, much of which Mr. Sinoimeri disputes as inaccurate or immaterial, *see* ECF No. 60-1, at 18-19 (arguing that Mr. Sinoimeri was Plaintiffs' employer because he was directly responsible for the wage violations); ECF No. 64-1, at 14, 21-22 (disputing whether Mr. Sinoimeri's decision to pay Bourbon's mortgage caused the wage statute violations and, if so, whether that is material). The court need not reach those arguments because the genuine disputes of fact on the first three factors of the economic reality test, taken together, preclude summary judgment. *See Orellana*, 332 F. Supp. 3d at 264 ("'The conflicting accounts of [defendant's] role with the restaurant present numerous disputes of material fact that could determine the legal conclusion' regarding [defendant]'s personal liability under the FLSA and the DCMWA." (quoting *Rodriguez v. Adams Rest. Grp.*, 308 F. Supp. 3d 359, 366 (D.D.C. 2018))). The court leaves "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" to the jury, as it must. *Reeves*, 530 U.S. at 150-51 (quoting *Liberty Lobby*, 477 U.S. at 255).

\*   \*   \*

Because there are disputes of material fact concerning whether Mr. Sinoimeri was Plaintiffs' employer for purposes of the Wage Statutes, the court will deny both parties' cross-motions for summary judgment on the issue.

### C. Piercing the Corporate Veil

In his motion for summary judgment, Mr. Sinoimeri also argues that—in the event that he is not directly liable as an employer under the Wage Statutes—Plaintiffs may not pierce the corporate veil to hold him personally liable for Cathedral's wrongdoing. *See* ECF No. 55-2, at 21. "The general rule is that a corporation is regarded as an entity separate and distinct from its

shareholders." *Lawlor v. District of Columbia*, 758 A.2d 964, 975 (D.C. 2000) (quoting *Vuitch v. Furr*, 482 A.2d 811, 815 (D.C. 1984)). "[T]he party seeking to disregard the corporate entity"—to pierce the corporate veil—"has [to] prove[] by affirmative evidence that there is (1) unity of ownership and interest, and (2) use of the corporate form to perpetrate fraud or wrong." *Vuitch*, 482 A.2d at 815. While no one factor is dispositive, courts generally consider "whether corporate formalities have been observed; whether there has been commingling of corporate and shareholder funds, staff and property; whether a single shareholder dominates the corporation; whether the corporation is adequately capitalized; and, especially, whether the corporate form has been used to effectuate a fraud." *Lawlor*, 758 A.2d at 975. "The inquiry ultimately turns on whether the corporation is, in reality, 'an *alter ego* or business conduit of the person in control.'" *Id.* (quoting *Labadie Coal Co. v. Black*, 672 F.2d 92, 97 (D.C. Cir. 1982)). Importantly, "[t]he question of whether the corporate veil should be pierced is generally one for a jury." *Kelleher v. Dream Catcher, LLC*, No. 16-CV-2092, 2019 WL 3458459, at *3 (D.D.C. July 31, 2019) (citing *Vuitch*, 482 A.2d at 816 n.6).

Mr. Sinoimeri argues that "[w]hen the nonmoving party (Plaintiffs) bears the ultimate burden of proof, the moving party (Defendant) may carry his initial procedural burden at summary judgment by doing no more than 'pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case.'" ECF No. 61, at 8 (quoting *Moses v. Howard Univ. Hosp.*, 567 F. Supp. 2d 62, 65 (D.D.C. 2008), *amended*, 601 F. Supp. 2d 1 (D.D.C. 2009), *and aff'd*, 606 F.3d 789 (D.C. Cir. 2010)). But here, as discussed below, Plaintiffs have produced at least some evidence that Cathedral was Mr. Sinoimeri's "alter ego." The burden is therefore on Mr. Sinoimeri as the party moving for summary judgment to demonstrate that "there is no genuine issue of material fact and judgment in the movant's favor is proper as a matter of law."

*Soundboard Ass'n*, 888 F.3d at 1267 (quoting *Ctr. for Auto Safety*, 452 F.3d at 805); *see* Fed. R. Civ. P. 56(a). The court concludes that Mr. Sinoimeri has not done so, and it will therefore deny his motion for summary judgment.

### 1.      Corporate formalities

The court first considers whether corporate formalities have been observed. *See Lawlor*, 758 A.2d at 975. Although Cathedral was "duly formed and registered as a separate entity, and maintained bank accounts in its name," ECF No. 57, at 29, Cathedral never had regular shareholder meetings during its five years of operation and did not keep meeting minutes, ECF No. 64-3 ¶ 161. At one point, one of Cathedral's members accused the managing members—including Mr. Sinoimeri—of failing to timely provide tax documents, including Forms K-1. *See* ECF No. 64-3 ¶ 153; ECF No. 58-7 (Pls. Ex. S).

Mr. Sinoimeri points the finger at Mr. Woods, arguing that "it was [Mr.] Woods, not [Mr.] Sinoimeri, who was responsible for maintaining corporate records." ECF No. 61, at 12; *see* ECF No. 64-1, at 6 ("[Mr.] Woods was solely responsible for running the day-to-day operations at Bourbon and was the President of Cathedral and accordingly was responsible for respecting corporate formalities during this period and failed to do so."). However, as discussed above, whether Mr. Woods in fact had sole control over Bourbon's operations is in genuine dispute. Further, Mr. Sinoimeri's only evidence for the proposition that Mr. Woods was solely responsible for the failure to respect corporate formalities is Cathedral's operating agreement, which he says "ma[de] [Mr.] Woods responsible for managing the business and affairs of the Company." ECF No. 57-1 ¶¶ 9-10; *see* ECF No. 61, at 12; ECF No. 64-1, at 6. But, as Plaintiffs point out, the operating agreement designates both Mr. Woods and Mr. Sinoimeri as "Managers," giving them "equal authority to act on behalf of the company when it came to management and business affairs." ECF No. 57-1 ¶ 9. Therefore, after drawing all reasonable inferences in favor of the

15

nonmoving party, it is possible that Mr. Sinoimeri played a role in Cathedral's disregard of corporate formalities.

### 2. Commingling

The court next considers "whether there has been commingling of corporate and shareholder funds, staff and property." *Lawlor*, 758 A.2d at 975. There is no genuine dispute that, in 2017, Mr. Sinoimeri transferred $30,000 of his own funds to Cathedral to cover payroll and expenses. ECF No. 64-3 ¶¶ 79-80. "[A] gift or loan of personal funds from an owner to a business endeavor is not necessarily commingling." *Kelleher*, 2019 WL 3458459, at *4. However, Mr. Sinoimeri also made withdrawals from Cathedral's bank account that Plaintiffs point to as evidence of possible commingling. Mr. Sinoimeri withdrew $10,000 in late 2015, $7,000 of which he subsequently wired back at Mr. Woods' request. ECF No. 64-3 ¶ 157. Mr. Sinoimeri argues that this was "a loan repayment at the direction of [Mr.] Woods." *Id.* However, the only evidence he offers to support that allegation is the following text message exchange:

> MR. SINOIMERI: Once we reach 20K in savings. Would it be okay for me to pull that 10K out?
>
> MR. WOODS: Yes please do.
>
> MR. SINOIMERI: Ok sounds good, thanks. Just wanted to make sure we didn't need it anymore.

ECF No. 58-1 (Pls. Ex. L), at 27; *see* ECF No. 64-3 ¶ 157. It is not clear whether "that 10K" refers to a loan Mr. Sinoimeri previously made to Cathedral, or to something else. Given the ambiguous nature of this text exchange and the requirement that the court draw all reasonable inferences in favor of the nonmoving party, the court cannot definitively conclude that this withdrawal was a legitimate loan repayment. *See Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

Between December 26, 2018 and January 25, 2019, Mr. Sinoimeri wrote himself a series of checks from Cathedral's operating account, totaling $10,500, for "reimbursements." ECF

No. 64-3 ¶ 160.  Between November 20, 2018 and January 30, 2019, he made a series of cash withdrawals from the same account.  *Id.*  Mr. Sinoimeri admits he made these withdrawals but, because these withdrawals were made after the alleged wage violations and were related to Parlay, not Bourbon, he maintains that they are "not material to determining whether [he] was Plaintiffs' statutory employer under the FLSA and D.C. Wage Statutes."  *Id.*  He does not, however, argue that these withdrawals are immaterial to whether Plaintiffs may pierce the corporate veil—a legal inquiry distinct from the question of whether Mr. Sinoimeri was Plaintiffs' statutory employer.  *See id.*; ECF No. 61, at 13-14 (arguing only that Mr. Sinoimeri's transfer of $30,000 to Cathedral is not evidence of "extensive commingling"); *Kalkey*, 2023 WL 8587965, at *11 ("[I]t is unnecessary to pierce the corporate veil to find individuals within a corporation personally liable for violations of the FLSA." (quoting *Qun Lin*, 239 A.3d at 735)).  Nor does Mr. Sinoimeri offer any evidence to support his claim that these withdrawals were legitimate reimbursements, rather than "diversion[s] of corporate funds for non-corporate uses."  *United States v. Dynamic Visions, Inc.*, 220 F. Supp. 3d 16, 25 (D.D.C. 2016), *aff'd*, 971 F.3d 330 (D.C. Cir. 2020).  Absent such evidence, it remains unclear whether Mr. Sinoimeri commingled funds.

### 3. Single shareholder domination

Plaintiffs argue that although Mr. Woods held the majority interest in Cathedral, "the trier of fact could also find that . . . [Mr.] Sinoimeri's control over the expenses, including the biggest expense of paying the mortgage, amounts to dominance over the corporation."  ECF No. 60-1, at 31.  Because Plaintiffs cite neither evidence nor case law to support this argument, the court need not address it.  *See Equal Rts. Ctr.*, 633 F.3d at 1141 n.3 (explaining that "mere allegations" are insufficient); Fed. R. Civ. P. 56(c)(3) (the court is only required to consider the materials cited by the parties).

### 4. Adequate capitalization

Mr. Sinoimeri does not seem to dispute that Cathedral was undercapitalized. *See* ECF No. 61, at 14. Rather, he argues that Cathedral's undercapitalization "was not through any fault of [Mr.] Sinoimeri's, but solely [Mr.] Woods' responsibility." *Id.* Again, however, the only evidence Mr. Sinoimeri cites for this proposition is Cathedral's operating agreement, which designates both Mr. Woods and Mr. Sinoimeri as "Managers," giving them "equal authority to act on behalf of the company when it came to management and business affairs." ECF No. 57-1 ¶ 9; *see* ECF No. 61, at 14. Further, Plaintiffs offer evidence that Mr. Sinoimeri may have contributed to Cathedral's undercapitalization. For example, in October 2015 "it appears Cathedral's savings (exclusive of the operating account balance) were less than $20,000"—far less than the $60,000 combined operating and capital reserves that Cathedral's budget called for—"and [Mr.] Sinoimeri was asking if he could withdraw $10,000 of that amount." ECF No. 60-1, at 30; *see* ECF No. 58-1 (Pls. Ex. L), at 27; ECF No. 64-3 ¶ 159; ECF No. 59-12 (Pls. Ex. KK) (Cathedral's budget).

Ultimately, "[w]hether capitalization is adequate is understandably a function of the type of business in which the corporation engages," *Labadie Coal Co.*, 672 F.2d at 99, and neither party has submitted "record evidence as to how much would have been an adequate amount to capitalize a business of [Cathedral's] size," *Kelleher*, 2019 WL 3458459, at *4. The court is therefore unable to determine whether Cathedral was adequately capitalized.

### 5. Fraud

Plaintiffs do not argue that Mr. Sinoimeri used Cathedral to effectuate fraud. *See* ECF No. 60-1, at 31. However, District law does not require a showing of actual fraud to pierce the corporate veil. *See Vuitch*, 482 A.2d at 815 ("[T]he court has held that considerations of justice and equity can justify piercing the corporate veil and has rejected the contention that in order to pierce the corporate veil there must be a showing of fraud.").

\* \* \*

Because there are genuine disputes of material fact regarding whether Mr. Sinoimeri disregarded corporate formalities, commingled funds, and undercapitalized Cathedral, the court cannot—as a matter of law—preclude Plaintiffs from piercing the corporate veil. The court will therefore deny Mr. Sinoimeri's motion for summary judgment.

## V.     Conclusion

For the foregoing reasons, it is hereby **ORDERED** that Defendant's amended motion for summary judgment, ECF No. 55, and Plaintiffs' cross-motion for partial summary judgment, ECF No. 60, are **DENIED**, and Defendant's motion for summary judgment, ECF No. 53, is **DENIED** as moot.

It is further **ORDERED** that the parties shall file a joint status report governing future proceedings, including whether they seek a referral to a Magistrate Judge for mediation, on or before August 23, 2024.

**SO ORDERED**.

/s/ Loren L. AliKhan
LOREN L. ALIKHAN
United States District Judge

Date: August 9, 2024